IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 21, 2015

## IN RE AALIYAH E.

**Appeal from the Juvenile Court for Monroe County**
**No. J14-307     Dwaine B. Thomas, Judge**

---

### No. E2015-00602-COA-R3-PT-FILED-JANUARY 26, 2016

---

This is a termination of parental rights case, focusing on Aaliyah E., the minor child ("the Child") of Wanda M. ("Mother") and Christopher E. ("Father"). The Child was taken into protective custody by the Tennessee Department of Children's Services ("DCS") on November 19, 2013, upon investigation of the Child's lack of legal guardianship while the parents were incarcerated. On October 30, 2014, DCS filed a petition to terminate the parental rights of Mother and Father. Following a bench trial, the trial court found that statutory grounds existed to terminate the parental rights of both parents upon its finding by clear and convincing evidence that (1) the parents abandoned the Child by failing to provide a suitable home, (2) the parents failed to substantially comply with the reasonable responsibilities and requirements of the permanency plans, and (3) the conditions leading to the Child's removal from the home persisted. As to Father, the court also found by clear and convincing evidence that prior to incarceration, he had abandoned the Child by showing wanton disregard for the Child's welfare. The court further found by clear and convincing evidence that termination of Mother's and Father's parental rights was in the Child's best interest. Mother and Father have each appealed. Having determined that, as DCS concedes, Mother was incarcerated during the entire applicable four-month statutory period following the Child's removal into protective custody, we reverse the trial court's finding regarding the ground of abandonment through failure to provide a suitable home as to Mother only. We affirm the trial court's judgment in all other respects, including the termination of Mother's and Father's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and CHARLES D. SUSANO, JR., J., joined.

Jon McMurray Johnson, Madisonville, Tennessee, for the appellant, Christopher E.

Jaime E. Dailey, Knoxville, Tennessee, for the appellant, Wanda M.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

The Child was born in September 2013 to Mother and Father, who were never married. DCS became involved with the Child in November 2013 through a referral alleging that the parents were incarcerated and that the Child was without a legal custodian. DCS's investigation revealed that Mother and Father had been together in a vehicle when they were stopped by the Etowah Police Department on November 16, 2013. Mother was subsequently incarcerated upon a charge of violation of probation, and Father was incarcerated upon a charge of driving while license revoked. At the time of this arrest, Mother had been serving probation for a conviction of theft in an amount under $500. Upon her incarceration, Mother arranged for a family friend, Ms. W., to take over the Child's care. Two days later, Ms. W. contacted DCS, stating that she feared the Child was becoming ill and that as a caretaker and not a legal guardian, she was unable to obtain medical care for the Child.

Upon DCS's subsequent petition alleging that the Child was dependent and neglected as to both parents, the trial court entered an *ex parte* order removing the Child into protective custody on November 19, 2013. DCS placed the Child with Ms. W. and her husband as foster parents. The Child continued to reside with the foster parents throughout the pendency of these proceedings. Following a preliminary hearing, the trial court found probable cause to determine the Child dependent and neglected as to both parents in an order entered December 19, 2013. Concomitant with this order, the court directed each parent, respectively, to pay $25.00 per week in child support. The court, also in December 2013, entered an agreed order to establish Father's paternity.

Prior to filing the petition for termination of parental rights, DCS developed two permanency plans for the Child and the parents. DCS presented both plans as exhibits during the termination proceedings. The first permanency plan was established on December 10, 2013, and ratified by the trial court on March 20, 2014. The parents indicated by their respective signatures that they had participated in the development of the plan. At the time the plan was developed, Father had been released from jail, remained on probation, and had been residing with his mother ("Paternal Grandmother"). He was employed at the time through a temporary agency. Mother remained

2

incarcerated. Under the initial permanency plan, the parents' relevant responsibilities and requirements were that they remain free of drugs; participate in visitation with the Child; obtain or maintain safe and stable housing; obtain or maintain employment; provide DCS with a transportation plan, which in Mother's case included showing proof of a valid driver's license; provide DCS with a child care plan; and follow court orders for child support. In addition, the plan included requirements that Father legitimate the Child and that Mother undergo a mental health assessment and follow all resultant recommendations.

DCS Family Service Worker Tiffany Hickey testified at trial that she had worked with the family throughout the pendency of the case and that she considered remaining free of drugs the most important goal on the permanency plan for Mother. The plan included as specific action steps to achieve this goal that Mother would complete an alcohol and drug assessment, following all resultant recommendations; submit to random drug screens or hair follicle testing; complete any requirements related to her incarceration; and refrain from obtaining any new criminal charges. Similarly, the plan included action steps that Father would complete an alcohol and drug assessment, following all recommendations; submit to random drug screens or hair follicle testing; follow all rules of probation; and not incur any additional criminal charges.

On January 24, 2014, Father was again arrested when the vehicle in which he was riding was stopped by police and an officer found evidence of a methamphetamine laboratory on another individual in the vehicle. Father subsequently pled guilty to violation of probation. He had been serving an eight-year sentence of probation for a methamphetamine-related conviction that predated the Child's removal into protective custody. Following his January 2014 arrest, Father remained incarcerated throughout the pendency of these proceedings. DCS presented certified copies of Father's criminal conviction judgments spanning the time period the Child was in protective custody. These judgments reflect that on November 12, 2013, he pled guilty in the Monroe County General Sessions Court to driving an unregistered vehicle, driving while license revoked, and violation of the financial responsibility law. As a result of the January 2014 incident, Father was convicted on February 19, 2014, by the Loudon County General Sessions Court of promotion of methamphetamine manufacture. Father also pled guilty on March 4, 2014, in the Monroe County General Sessions Court to driving while license revoked.

The trial court adjudicated the Child dependent and neglected as to Mother at a hearing conducted March 20, 2014, during which Mother stipluated that she was unavailable to care for the Child due to her incarceration. At that time, the court granted a continuance to Father pending the result of the DNA paternity test. Upon subsequent confirmation of Father's paternity, the court adjudicated the Child dependent and

3

neglected as to Father at a hearing conducted June 19, 2014, during which Father stipulated that he was unavailable to care for the Child due to his incarceration.

Mother was released from incarceration in May 2014 and did not incur any further criminal charges through the time of trial. While incarcerated, Mother completed an alcohol and drug assessment and mental health assessment through Helen Ross McNabb Center. Mother's case coordinator for Helen Ross McNabb, Cindy Starr, testified that during Mother's incarceration, Mother participated in parenting instruction sessions and family behavioral therapy. According to Ms. Starr, she met with Mother a few times following Mother's May 2014 release from jail, but by July 2014, Mother was no longer appearing for scheduled meetings. Helen Ross McNabb discharged Mother from its program for noncompliance in July 2014. A hair follicle drug screen administered to Mother on July 22, 2014, yielded a positive result for methamphetamine, amphetamine, and marijuana. A urinalysis drug screen administered at the same time also showed oxycodone and 3,4-methylenedioxy-methamphetamine ("MDMA" or "ecstasy") in Mother's system. Undisputed testimony indicated that Mother participated in supervised visitation with the Child regularly during this time period.

The second permanency plan was established on September 5, 2014, and ratified by the trial court on October 16, 2014. Mother participated in a child and family team meeting during which the plan was developed, and she indicated agreement with it. Father was incarcerated at the time in the Bledsoe County Correctional Complex and was not able to participate in the meeting. Father's counsel, however, was present during development of the permanency plan. It is undisputed that Father was provided with a copy of the plan soon after its establishment. Requirements and responsibilities under this second plan remained essentially as under the first plan, except that the legitimization step was removed from Father's plan as completed and Mother was required to obtain a new alcohol and drug assessment and follow resultant recommendations. In addition, the court, in its order ratifying the permanency plan, directed Mother to pay $45.00 per week in child support.

Following establishment of the second permanency plan, Mother completed a second alcohol and drug assessment through Omni Visions, Inc., an in-home service to which Mother was referred by DCS. According to Ms. Hickey, while DCS administered several drug screens to Mother subsequent to July 2014, Mother consistently tested positive for controlled substances. At the time of the court's October 2014 child support order, Mother was employed. She subsequently testified, however, that she was terminated from her employment due to a transportation problem. On December 30, 2014, Mother submitted to a hair follicle screen, testing positive for amphetamines, methamphetamine, and marijuana. Mother did continue to participate regularly in supervised visitation with the Child.

On October 30, 2014, DCS filed a petition to terminate the parental rights of Mother and Father, alleging, as to both parents, statutory grounds of (1) abandonment through failure to provide a suitable home, (2) substantial noncompliance with the permanency plans, and (3) persistence of conditions leading to the Child's removal into protective custody. As to Father, DCS alleged a fourth statutory ground of abandonment through wanton disregard for the Child's welfare prior to Father's incarceration. The trial court subsequently appointed counsel to represent each parent and attorney Susan Rushing as guardian *ad litem*.

Following a bench trial conducted on February 13, 2015, the trial court determined that grounds existed to terminate the parental rights of Mother and Father. The court found by clear and convincing evidence that the parents had abandoned the Child by failing to provide a suitable home and had failed to substantially comply with the reasonable responsibilities and requirements of the permanency plans. The court also found as to both parents clear and convincing evidence of the statutory ground of persistence of the conditions leading to the Child's removal. As to Father only, the court found clear and convincing evidence of the statutory ground of conduct prior to incarceration demonstrating wanton disregard for the Child's welfare. In addition, the court found by clear and convincing evidence that termination of Mother's and Father's parental rights was in the best interest of the Child. The court entered an order to this effect on March 19, 2015. Each parent separately filed a timely appeal.

## II. Issues Presented

On appeal, Mother presents four issues, which we have restated as follows:

1. Whether the trial court erred by finding clear and convincing evidence that Mother abandoned the Child by failing to establish a suitable home.

2. Whether the trial court erred by finding clear and convincing evidence that Mother had substantially failed to comply with the statements of responsibilities in the permanency plans.

3. Whether the trial court erred by finding clear and convincing evidence that the conditions that led to the Child's removal into protective custody persisted.

5

4. Whether the trial court erred by finding clear and convincing evidence that it was in the Child's best interest to terminate Mother's parental rights.

Father presents two issues, which we have similarly restated as follows:

5. Whether the trial court erred by finding clear and convincing evidence that Father abandoned the Child by failing to establish a suitable home.

6. Whether the trial court erred by finding clear and convincing evidence that Father had substantially failed to comply with the statements of responsibilities in the permanency plans.

In addition, DCS raises the following issue, which we have restated slightly as follows:

7. Whether the trial court erred by finding clear and convincing evidence that it was in the Child's best interest to terminate Father's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36-1-113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims* (*In re N.B.*), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

## IV. Statutory Abandonment

Tennessee Code Annotated § 36-1-113 (Supp. 2015) lists the statutory grounds for termination of parental rights, providing as follows:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

7

The trial court determined, *inter alia*, that Mother and Father had abandoned the Child by failing to establish a suitable home. The court also determined that Father had abandoned the Child by engaging in conduct prior to his incarceration that exhibited wanton disregard for the Child's welfare. *See* Tenn. Code Ann. § 36-1-113(g)(1).

### A. Failure to Provide a Suitable Home

Tennessee Code Annotated § 36-1-113(g)(1) provides, as a statutory ground for termination:

> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . . .

Tennessee Code Annotated § 36-1-102(1)(A) (Supp. 2015) defines abandonment, in relevant part, as:

> (ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . . .

In its final judgment, the trial court stated specific findings of fact regarding this statutory ground as follows:

8

In this case, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii), the Court finds that there is clear and convincing evidence that the parents constructively abandoned the child by failing to provide a suitable home for the child. The Monroe County Juvenile Court adjudicated the child dependent and neglected and placed her in DCS custody after she was removed from the parents' home on November 18, 2013. The mother was incarcerated during the first six months the child was in custody. This was because she was ordered to serve six months or until her probation fees were paid. After her release, she resided with various people and was discharged from her alcohol and drug program due to noncompliance. The father was initially released from his incarceration and resided with relatives before he was again arrested and incarcerated in January 2014.

The Court finds that DCS provided reasonable efforts to assist the parents to establish a suitable home for the child by providing them with a list of housing available in the area, providing local classified ads of housing and employment to the parents, referring both parents to the New Beginnings program for alcohol and drug treatment and parenting, providing drug screens to the parents, and providing visitation with the child. Although the mother reports that she now has stable housing, the Court is concerned that this housing has only occurred the week of trial. Even if DCS had time to inspect the home, which they did not in this case, the mother has not resided there long enough to show that this is a safe and stable environment for the child. The Court also finds that the father is incarcerated primarily due to his own choices.

We will address Mother's and Father's respective issues regarding this statutory ground in turn.

### 1. Mother

Mother's contention that the trial court erred by finding clear and convincing evidence of this statutory ground is based in part on her assertion that she was incarcerated and unable to make reasonable efforts toward establishing a suitable home for the Child during the four months following the Child's removal. On appeal, DCS concedes this fact and has elected not to defend the statutory ground of abandonment through failure to provide a suitable home as to Mother. The applicable four-month determinative period began with the Child's removal into protective custody on November 19, 2013, and concluded on March 19, 2014. *See, e.g., In re V.L.J.*, No.

9

E2013-02815-COA-R3-PT, 2014 WL 7418250 at *9 (Tenn. Ct. App. Dec. 30, 2014). It is undisputed that Mother was not released from incarceration until May 2014. We agree with the parties that during the determinative time period, Mother was unable to make reasonable efforts toward establishing a suitable home and DCS personnel were constrained in their efforts to assist her. *See, e.g., In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220 at *7 (Tenn. Ct. App. July 13, 2015) (concluding that this statutory ground was inapplicable to the father in part because "DCS admittedly could not assist Father in establishing a suitable home while he was incarcerated."). We therefore reverse the trial court's judgment regarding this statutory ground as to Mother.

2. Father

Father similarly contends that the trial court erred by finding clear and convincing evidence of this statutory ground as applied to him due to his incarceration for all but one month and fourteen days of the determinative period. He argues that this short time period did not afford him an opportunity to make reasonable efforts to establish a suitable home. Father's argument ignores the fact that he was incarcerated a second time during the determinative period as a result of his poor choices subsequent to the Child's removal into protective custody. As the trial court noted, Father was released soon after his November 2013 incarceration and the Child's removal into protective custody. For the approximately one and one-half months that he was not incarcerated, Father was employed and resided with Paternal Grandmother. Ms. Hickey testified that during this period, DCS provided services for Father to obtain an alcohol and drug assessment, drug screenings free of charge, and a referral to the New Beginnings Program at Helen Ross McNabb, as well as referrals to alternative agencies. Ms. Hickey personally printed information from local housing authorities for Father to contact and provided him with local employment advertisements. Father does not dispute the trial court's finding that DCS made reasonable efforts to assist him in obtaining a suitable home while he was able to make progress in that regard.

We agree with the trial court that Father subsequently "was incarcerated primarily due to his own choices." *See, e.g., In re Weston T.R.*, No. M2012-00580-COA-R3-PT, 2012 WL 3804414 at *1 (Tenn. Ct. App. Aug. 31, 2012) (concluding that the child had no meaningful relationship with the father "due to Father's life choices, which have resulted in repeated arrests and periods of incarceration."). It is undisputed that during the time period when he was not incarcerated, Father tested positive for controlled substances on three occasions. On December 6, 2013, Father tested positive for amphetamine, benzodiazepines, methamphetamine, and marijuana; on December 19, 2013, he tested positive for amphetamine, methamphetamine, and marijuana; and on January 21, 2014, he tested positive for marijuana. By his own admission, Father's arrest in January 2014 occurred when, while on probation, he rode in a vehicle with an

individual known to him to use methamphetamine. At trial, Father, who was serving an eight-year sentence, testified that he had been denied parole in December 2014 and would next be eligible for parole in July 2016. It is undisputed that Father was in no position at the time of trial to provide a suitable home for the Child and could not expect to do so in the near future. The evidence does not preponderate against the trial court's finding, by a clear and convincing standard, that Father abandoned the Child pursuant to the statutory ground of failure to provide a suitable home.

### B. Wanton Disregard for the Child Prior to Incarceration

The trial court also found by clear and convincing evidence that prior to his incarceration, Father had abandoned the Child through conduct exhibiting wanton disregard for the Child's welfare. Father does not raise this statutory ground as an issue, and DCS thereby argues that Father has waived this ground on appeal. Due to the fundamental constitutional interest involved, however, we will address this ground as well. *See, e.g., In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010); *Keisling*, 92 S.W.3d at 378; *In re Arteria H.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010), *perm. app. denied, overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015).

The applicable definition of abandonment for this statutory ground provides that for purposes of instituting an action to terminate parental rights:

> [a] parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv). This Court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). Upon our thorough review of the record, we conclude that clear and convincing evidence exists that Father abandoned the Child through his conduct prior to incarceration by exhibiting wanton disregard for the Child's welfare.

11

V. Substantial Noncompliance with Permanency Plans

The trial court also found clear and convincing evidence that Mother and Father failed to substantially comply with the reasonable responsibilities set out in their permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4; . . . .

In its final judgment, the trial court stated specific findings of fact regarding this statutory ground as follows:

In this case, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2), the Court finds that there is clear and convincing evidence that [Father] and [Mother] failed to substantially comply with the permanency plans in this case. After the child came into state custody, DCS created permanency plans for her. The plans required the parents to complete an alcohol and drug assessment and follow all recommendations; submit to random drug screens and/or hair follicle drug screens; resolve legal issues and not incur any new charges; be able to provide a stable income and housing for the child; and provide a reliable transportation plan for the child. The plans also required [Father] to legitimate the child through DNA testing and [Mother to] complete a mental health assessment and follow all recommendations and be able to provide a plan for child care. Both the parents signed the plans on December 10, 2013 expressing their agreement with the plans as well as an explanation of the reasons their parental rights could be terminated.

The Juvenile Court ratified the initial permanency plans on March 20, 2014 as in the child's best interests and found that the requirements for the parents were reasonably related to remedying the reasons for foster care. The permanency plans were revised on September 5, 2014. The revised plans reiterated the requirements in the initial plans and added the following requirements for [Mother]: complete a new alcohol and drug assessment and follow all recommendations and provide DCS with proof of employment. [Mother] signed the revised plans on September 5, 2014 and DCS mailed the plan to [Father]. The Juvenile Court ratified the revised permanency plans on October 16, 2014 as in the child's best interests and

12

found that the revised requirements for [Mother and Father] were reasonably related to remedying the reasons for foster care.

The parents have not substantially complied with the responsibilities and requirements set out for them in the permanency plans. [Father] is incarcerated and did not complete any of the requirements of the plan prior to his incarceration. He was able to complete the DNA testing during his incarceration as well as a program titled "Team Dad." [Mother] worked with the Helen Ross McNabb program addressing substance abuse, mental health and parenting, but was discharged for noncompliance. After her discharge and a failed hair follicle drug screen for methamphetamine, the permanency plan was revised. [Mother] has not completed any of the tasks on the revised plan. The Court finds that her current living situation is too new to be considered stable.

DCS made reasonable efforts to help the parents to satisfy the requirements in the permanency plan by providing the parents with a list of housing available in the area, providing local classified ads of housing and employment to the parents, referring the family to the Helen Ross McNabb New Beginnings Program, providing the parents with a local resource guide, providing the parents with drug screens and hair follicle drug testing, writing a letter to Sweetwater Housing Authority asking for [Mother] to be placed on the waiting list for housing, providing visitation with the child, providing ongoing advice and recommendations to the family, visiting with the parents in jail to go over permanency plan[s] and progress, and providing for the daily care and support of the child.

Upon careful review, we determine that a preponderance of the evidence supports the trial court's findings that Mother and Father failed to substantially comply with the reasonable responsibilities of their permanency plans. We will address Mother's and Father's respective issues regarding this statutory ground in turn.

A. Mother

In particular, Mother's responsibilities under the permanency plans included undergoing a mental health assessment and following all resultant recommendations, remaining free of drugs, participating in visitation with the Child, providing safe and stable housing for the Child, maintaining employment, providing DCS with proof of a valid driver's license and transportation plan, providing DCS with a child care plan, and following court orders for child support. In order to achieve the goal of remaining free of drugs, Mother was to complete specific action steps, including undergoing alcohol and

drug assessments, following all recommendations resulting from the assessments, submitting to random drug screens or hair follicle testing, completing any requirements related to her incarceration, and refraining from incurring any new criminal charges.

Mother contends that the trial court erred by finding clear and convincing evidence of this statutory ground because she had made significant progress on many of the plan requirements and was continuing to exert reasonable efforts toward complying with requirements at the time of trial. Upon careful review of the record, we disagree with Mother on this issue. Mother did make some progress toward compliance with the permanency plans. It is undisputed that she consistently participated in visitation with the Child. Ms. Hickey testified that Mother behaved appropriately toward the Child during visits and typically brought small gifts or treats for the Child to the visits. Following her release from incarceration in May 2014, Mother did not incur any additional criminal charges through the time of trial. Mother also submitted to a mental health assessment and two alcohol and drug assessments, as well as several random drug screens.

Mother was required to undergo a second alcohol and drug assessment because she had again tested positive in July 2014 for several controlled substances and had been discharged from her substance abuse program for noncompliance. Ms. Starr testified that during incarceration, Mother actively engaged with the substance abuse program provided by Helen Ross McNabb. Upon Mother's release, however, she soon began to miss scheduled meetings and did not complete the program. Mother asserts that because by the time of trial, she was again participating in a substance abuse program, then provided by Omni Visions' in-home services, she had substantially progressed toward the requirement of remaining free of drugs. Although Mother's willingness to enter a second program is commendable, we note that drug screens performed close to and on the date of trial demonstrated that Mother was still using controlled substances. At trial, Mother admitted to having turned to controlled substances when she was served with the termination petition in November 2014. A December 30, 2014 hair follicle screen reflected positive results for amphetamines, methamphetamine, and marijuana. On the day of trial approximately six weeks later, Mother tested positive for oxycodone. When questioned regarding the oxycodone result, Mother testified that six weeks before trial, she had sought treatment for an injured foot at a hospital emergency room and had been prescribed a course of pain medication, which she had completed taking in one week. The trial court expressly found Mother's testimony in this regard not credible. *See Jones,* 92 S.W.3d at 838 (explaining that a trial court's determinations regarding witness credibility are entitled to great weight on appeal).

As to the remaining requirements, at the time of trial, Mother was unemployed, had not paid court-ordered child support, had a suspended driver's license due to nonpayment of support, and had notified DCS of a new housing situation only three days

14

before trial. Ms. Hickey acknowledged that Mother had met the requirement of providing DCS with a transportation plan, which according to Mother, included the maternal aunt's willingness to provide transportation upon learning that Mother was making changes in her life. Ms. Hickey also indicated that Mother had arranged for Ms. W. to provide child care when needed in the event that the Child was returned to Mother's home.

Mother argues that the trial court should have taken her efforts toward compliance into greater consideration, particularly her testimony that she had applied for several employment positions to no avail, had lost her previous employment with a temporary agency due to a lack of transportation, and had recently reunited with her father ("Maternal Grandfather") to live with him in a trailer for which he paid month-to-month rent. Concerning this housing situation, the court found it too new and tenuous to be considered stable. As Mother acknowledged, Maternal Grandfather was a parolee who had been recently incarcerated for several years. Although Maternal Grandfather was employed and apparently willing to have the Child reside in the home, he and Mother had only been living in the same household for approximately one month. As Mother described their living situation, Maternal Grandfather and she "went to a motel room to apartment to a bigger apartment, and now [they] have recently moved into a trailer." Ms. Hickey testified that with only three days' notice prior to trial, she had not been able to schedule a home visit to investigate the suitablity of Mother's new home.

The evidence does not preponderate against the trial court's finding that Mother's living situation was "too new to be considered stable." Mother was therefore in substantial compliance only with the requirements that she participate in visitation with the Child and provide DCS with transportation and child care plans. Upon our thorough review of the record, we conclude that the trial court did not err in terminating Mother's parental rights based upon clear and convincing evidence of this statutory ground.

## B. Father

As with Mother, Father's responsibilities and requirements under the permanency plans included remaining free of drugs, participating in visitation with the Child, providing safe and stable housing for the Child, obtaining and maintaining employment, providing DCS with proof of a valid driver's license and transportation plan, providing DCS with a child care plan, and following court orders for child support. In order to achieve the goal of remaining free of drugs, Father was also to complete specific action steps, including completing an alcohol and drug assessment, following all assessment recommendations, submitting to random drug screens or hair follicle testing, following all rules of probation, and refraining from incurring any additional criminal charges. In addition, the first permanency plan set forth the requirement that Father would legitimate

15

the Child. Father does not dispute the trial court's finding that the only plan requirement he completed was DNA testing to legitimate the Child. As the court noted, Father also provided proof that he had completed a parenting program for incarcerated fathers, although this program was not a requirement set forth in the permanency plans.

Father contends that the trial court erred by finding clear and convincing evidence of this statutory ground because his incarceration prevented him from completing the reasonable requirements set forth in the permanency plans. He testified that he had been unable to complete an alcohol and drug assessment or substance abuse program while incarcerated because such programs were not offered at the facility in which he was housed. As we determined in the previous section of this opinion, Father's argument concerning the effect of his incarceration ignores his own culpability in actions that led to his incarceration two months following the Child's removal into protective custody. *See, e.g., In re Weston T.R.*, 2012 WL 3804414 at *1.

Father asserts that he "was not given a real opportunity to make adjustments to his lifestyle that could have allowed him to eventually regain[] custody of [the Child] . . . ." In support of this assertion, Father alludes to this Court's decision in *In re C.H.E.H.*, No. E2007-01863-COA-R3-PT, 2008 WL 465275 at *10 (Tenn. Ct. App. Feb. 21, 2008) (reversing the trial court's termination of the mother's parental rights on this statutory ground when the mother had made "considerable efforts to complete the requirements under the Revised Plan" and had remained "clean and sober" for one year while enrolled in a housing program different from the drug treatment program identified in the plan). As this Court explained:

> Although we agree that the public policy of this State is to avoid leaving children in the limbo of foster care any longer than necessary, we also believe that parents must be given, as realistic under the specific facts of each case, a real opportunity to make adjustments to their lifestyle to regain custody of their children.

*In re C.H.E.H.*, 2008 WL 465275 at *11. Contrary to Father's argument, we conclude that he was afforded such a "real opportunity" upon the Child's removal into protective custody and prior to committing the actions that led to his subsequent incarceration. Considering the totality of the evidence, we determine that the trial court did not err in also terminating Father's parental rights upon clear and convincing evidence of the statutory ground of failure to substantially comply with the permanency plans.

## VI. Persistence of Conditions Leading to the Child's Removal

The trial court further found clear and convincing evidence, as to both parents, of the statutory ground of persistence of conditions leading to removal of the Child from the parents' home. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) provides:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . .

In its final judgment, the trial court stated the following specific findings regarding this statutory ground:

In this case, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(3), the Court finds that there is clear and convincing evidence that it has now been sixteen months since the Juvenile Court's protective custody order removed the child from the parents' home and that the conditions which led to her removal still persist. DCS removed the child from her home because both parents were incarcerated and the child had been left with a caregiver who was unable to seek medical treatment for her. [Father] is still incarcerated and [Mother] was released from jail in May 2014. Other conditions in the home exist that, in all reasonable probability, would lead to further neglect or abuse of the child in that the mother has not addressed her substance abuse and mental health issues. The Court further finds, by clear and convincing evidence, that there is little chance that those conditions will be remedied soon so that the child can be returned safely to the home because,

17

for sixteen months, DCS made reasonable efforts to help the parents remedy them, to no avail. The Court finds that it will be years before the parents would be able to provide adequate care for the child and continuation of the parent/child relationship greatly diminishes the child's chances of being placed into a safe, stable and permanent home.

## A. Mother

We first address the issue raised by Mother concerning this statutory ground. Upon careful review, we determine that a preponderance of the evidence supports the trial court's findings as to persistence of the conditions leading to removal of the Child from Mother's home. As the trial court noted, the Child was removed into protective custody because the parents were incarcerated and had left the Child with a caregiver who was not her legal guardian and was therefore unable to seek medical treatment for her. In support of her argument that these conditions no longer persisted at the time of trial, Mother asserts that she had not been incarcerated since her release from jail in May 2014. In response to the court's finding that "[o]ther conditions in the home exist that, in all reasonable probability, would lead to further neglect or abuse of the child in that the mother has not addressed her substance abuse and mental health issues," Mother asserts that a mental health assessment had specified no mental health issues for her to address and that she was, by the time of trial, again in the process of addressing her substance abuse issues. Although Mother's assertions, as far as they go, are supported by the evidence, we agree with DCS that Mother had not remedied conditions to the point that she could care for the Child or would be able to care for the Child in the foreseeable future.

As the trial court noted in remarks made at the close of trial, Mother's continuing struggle with substance abuse was closely linked to the actions that led to her incarceration and inability to care for the Child when the infant was two months of age. Mother's actual criminal charge from the November 2013 incident was violation of probation resulting from a previous conviction for theft under $500. The trial court, however, in its December 2013 preliminary hearing order, found that probable cause had been established to find the Child dependent and neglected due to "drug use of both parents." Mother waived her right to an evidentiary hearing on probable cause during the dependency and neglect proceedings and subsequently stipulated during the adjudicatory hearing that she was unable to care for the Child at that time due to her incarceration. Upon Mother's release from incarceration in May 2014, she consistently tested positive for controlled substances in several random drug screens. Mother admitted to reacting to the news that a termination petition had been filed by using drugs. She insisted at trial that she now felt ready to address her substance abuse issues through the Omni Visions

program in which she was participating. She acknowledged, however, that she had only been working with Omni Visions for approximately one month.

Mother also argues that by the time of trial, she had established a stable home with Maternal Grandfather and that the Child would be able to safely reside with her there. As the trial court found, Maternal Grandfather's presence in the home was troubling due to his history of incarceration and present parole status. Mother testified that one of the reasons she adamantly did not want to lose her parental rights was because she herself had "aged out" of foster care. She acknowledged that when she was placed in protective custody as a child, her mother and father were both incarcerated. She stated that Maternal Grandfather had recently come back into her life and had become a key person in her personal support system. We recognize, as did the trial court, that Mother's struggles began early in life and that she was rightfully encouraged by a renewed familial relationship. Mother, however, had only resided with Maternal Grandfather for approximately one month and in the actual trailer he was renting for less than two weeks. She had not notified DCS regarding the new living situation until three days before trial. As the court stated in remarks at the close of trial, it had no way to test the physical environment into which Mother proposed to bring the Child.

Moreover, the trial court found Mother's testimony that she was successfully addressing her substance abuse issues not credible. The court explained in its remarks made at close of trial:

> I don't feel that you've [Mother] been completely truth[ful] with me today. I don't feel that you're really being completely truthful with yourself yet. I think you still have a drug problem. If you failed for the drug that you failed for as recently as you failed for – and I do hope that you have turned the corner and you've found what it was that made you turn the corner. But even if you have turned that corner, without some pretty serious help with the things that you tested for, a month's time is not enough, nowhere near enough.

We emphasize again that the trial court's findings as to witness credibility are entitled to great weight on appeal. *See Jones,* 92 S.W.3d at 838. When questioned regarding whether she was at a stable point in her life such that she would be able to care for the Child, Mother stated: "Now, but a month ago, no." Mother's testimony indicates that she realized how newfound her purported progress was. We agree with the trial court that such progress was too tenuous to constitute a change in the conditions that had led to the Child's removal.

The evidence also demonstrated that continuation of the parent-child relationship would greatly diminish the Child's chances of integration into a safe, stable, and permanent home. We conclude that the trial court properly terminated Mother's parental rights based on clear and convincing evidence of this statutory ground.

## B. Father

Father has not raised this statutory ground as an issue on appeal. As with the previous ground not raised by Father, however, we address this statutory ground due to the constitutional interests involved. *See, e.g., In re Angela E.*, 303 S.W.3d at 251 n.14; *In re Arteria H.*, 326 S.W.3d at 184. Upon our thorough review of the record, and particularly in light of Father's continued incarceration, we conclude that the trial court properly terminated Father's parental rights based on clear and convincing evidence that the conditions leading to removal of the Child into protective custody persisted. Furthermore, the evidence demonstrated that continuation of the parent-child relationship between Father and the Child also would greatly diminish the Child's chances of integration into a safe, stable, and permanent home.

## VII. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Arteria H.*, 326 S.W.3d at 175 ("A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest."), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). Tennessee Code Annotated § 36-1-113(i) (Supp. 2015) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.,* 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

At the conclusion of trial, the trial court considered a recommendation from the guardian *ad litem* that it would be in the Child's best interest to terminate the parental rights of Mother and Father. The court subsequently analyzed the best interest factors, specifying in its final judgment the following findings of fact in relevant part:

In this case, the Court finds that there is clear and convincing evidence that termination of [Mother's and Father's] parental rights is in the best interest of the child. The parents have not made changes in their conduct or circumstances that would make it safe for the child to go home. The father is still incarcerated and the mother has not addressed her substance abuse issues or demonstrated that she can provide a stable home for the child. Of specific concern to the Court is that the mother seems to minimize her drug use. Further, the parents have not made lasting changes in their lifestyle or conduct. Despite help from the state for sixteen months, the father remains incarcerated and the mother's self-reported "stability" has only come about since the petition to terminate parental rights was filed.

Termination of parental rights is in the best interest of the child because there is crime in the parents' home. The father remains incarcerated so there is no physical environment to inspect. The mother has reported that she is currently residing with her father who was recently released from a lengthy incarceration.

Termination of parental rights is in the best interest of the child because the parents use drugs, rendering them consistently unable to care for the child in a safe and stable manner. Due to father's incarceration, the Court cannot speculate as to what his drug use would be if he were not incarcerated, however, he did admit to drug use and he has not completed any program to address that drug use to date. As to the mother, of specific concern to the Court is that she minimizes her drug use and the Court does not find that the mother is being entirely truthful in her testimony as to her drug use. The mother was discharged from one alcohol and drug program and has not completed a second program as of this date. Also, termination of parental rights is in the best interest of the child because the mother has not addressed her mental health needs as of this date.

Further, [t]ermination of parental rights is in the best interest of the child because changing caregivers would have a detrimental effect on her. She was only two months old at the time she was removed from the parents. She has only known the home she is currently in and does not

truly have a meaningful parent/child relationship with the parents. The child is settled, comfortable, safe and stable in her current home.

The trial court therefore concluded that it was in the Child's best interest to terminate Mother's and Father's parental rights. Upon careful review, we agree with this conclusion. We will address the best interest analysis regarding each parent in turn.

## A. Mother

Mother first contends that the trial court erred by entering into analysis of the Child's best interest. *See In re Audrey S.*, 182 S.W.3d at 877 (explaining that a trial court must consider the best interest of the child upon having found clear and convincing evidence of a statutory ground for termination of parental rights). She asserts that the court erred in finding clear and convincing evidence of any statutory grounds as to Mother. Having determined that the court did not err in terminating Mother's parental rights based on the statutory grounds of substantial noncompliance with the permanency plans and persistence of conditions leading to removal, we further determine that Mother's contention in this regard is unavailing.

In the alternative, Mother argues that the court erred in its analysis of the statutory best interest factors by finding that (1) no meaningful relationship had been established between Mother and the Child (factor four), (2) Mother's mental status was potentially detrimental to the Child, (factor eight), (3) Mother had not effected a lasting adjustment in the circumstances or condition of her living environment (related to factors one, two, and seven) and (4) DCS had provided reasonable efforts to assist Mother in locating suitable housing (factor two). *See* Tenn. Code Ann. § 36-1-113(i). Upon our careful review, we disagree with Mother on this issue.

As to factor four, whether a meaningful relationship had been established between Mother and the Child, the trial court explained in its remarks made at the close of trial:

> Number four, meaningful relationship. Where I see the problem, although you [Mother] have visited and made contact efforts for sixteen months out of an eighteen month old . . . this child has been in somebody else's custody. This child has been kept and has been provided for, has otherwise looked to someone else for [her] care. So I do not find by clear and convincing evidence a meaningful relationship has been established. Now, that doesn't mean I don't think you love the child and I don't think the child knows who you are, it just means I don't think it's meaningful in that this child has no expectation of support or expectation of provision or care from you.

23

It is undisputed that Mother consistently engaged in visitation with the Child and behaved appropriately toward the Child during visits. At the time of trial, Mother had been visiting with the Child twice a month for approximately two hours per visit. Ms. Hickey testified that the eighteen-month-old Child "recognize[d]" Mother. When questioned regarding whether Mother and the Child shared a bond, Ms. Hickey opined that "there is a beginning bond there, yes." Ms. Hickey also testified, however, that in the foster home, the Child "seems to be bonded and appears to have a sense of permanency where she's at." In describing this bond, Ms. Hickey noted that the Child had transitioned "from a baby to a toddler" in the care of the foster parents. Mother testified that the Child calls her "mama," but Mother also acknowledged that the Child "probably" believes the foster parents are her parents. As the trial court found, testimony indicated that the Child recognized Mother as a frequent visitor but looked to the foster parents for parental nurturing and support. We conclude that the evidence does not preponderate against the trial court's finding regarding this factor. Furthermore, we note that the factor of whether a meaningful parent-child relationship had been established was only one of several factors the court found relevant to its analysis of the Child's best interest. *See In re Audrey S*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case.").

As to Mother's mental condition, *see* Tenn. Code Ann. § 36-1-113(i)(8), Mother argues that because her mental health assessment did not reflect a mental illness or treatment needed for such, the trial court erred by finding that she "had not addressed her mental health needs." Mother's argument regarding this factor ignores the correlation the court found between Mother's continued substance abuse and her mental and emotional health. Mother explained that she had suffered emotionally as a child from several years spent in foster care after her removal into protective custody due to her parents' respective incarcerations and her subsequent isolation from family members. In acknowledging that she had turned to drugs when she learned the termination petition had been filed, Mother stated:

> I felt hopeless. And I am ready to change. I realize that I messed up and I admitted to the court that I was, that I did relapse. And in November when I got the papers telling me that this [trial] was coming up . . . I felt hopeless and I had no support system, and I'm trying to build up. I started building a support system, and I'm ready to remain clean and to do what I can do to get [the Child].

Pursuant to factor eight, the trial court is to consider "[w]hether the parent's or guardian's <u>mental and/or emotional status</u> would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child."

*See id.* (emphasis added). The court in its remarks at close of trial explained regarding this factor in pertinent part:

> [F]rom the mother's point of view, we have had proof. She's been out of custody, she's failed drug screens, she's been served with paperwork, she's failed drug screens. I understand, I truly understand despair. I understand what despair can do to you. But the fact of the matter is, by that happening and by your testimony and admission today, I find by clear and convincing proof that that mental – and I'm not saying that that's a mental handicap, I'm trying to say it's a mental condition that would prevent you from caring for this child safely.

We determine that the evidence also does not preponderate against the trial court's finding as to the statutory factor of Mother's mental and emotional status as it would affect her ability to safely provide care and supervision for the Child.

Regarding Mother's housing situation, as explained in a previous section of this opinion, we have determined that the evidence does not preponderate against the trial court's finding that Mother was not in a position at the time of trial to provide a safe and stable home for the Child. Therefore, we further determine that the evidence does not preponderate against the court's finding that Mother failed to make an adjustment of circumstance, conduct, or conditions as to make it safe and in the Child's best interest to be in her home. *See* Tenn. Code Ann. § 36-1-113(i)(1). In addition, the court found that factor seven weighed against preserving Mother's parental rights because the physical environment of Mother's home was not healthy and safe for the Child due to the potential for the presence of controlled substances and the presence of a recent parolee, Maternal Grandfather, unknown to DCS or the court. *See* § 36-1-113(i)(7).

Although Mother concedes that DCS exerted reasonable efforts to assist her in other areas, she argues that DCS failed to expend reasonable efforts to assist her in establishing a suitable home. She thereby argues that the trial court erred by failing to properly weigh said alleged lack of reasonable efforts in its best interest analysis. *See* Tenn. Code Ann. § 36-1-113(i)(2); *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015) ("DCS's lack of reasonable efforts may weigh heavily enough to persuade the trial court that termination of the parent's rights is not in the best interest of the subject child."). The trial court, however, found at each stage of the proceedings that DCS had extended reasonable efforts to assist the parents. It is undisputed that DCS provided Mother with a list of available housing, as well as local newspapers with classified advertising for housing. It is also undisputed that upon Mother's release from incarceration, Ms. Hickey wrote a recommendation letter on Mother's behalf to a local housing authority. Ms. Hickey testified that prior to Mother's cohabitation with Maternal Grandfather, Mother

had reported an address in Tellico Plains, Tennessee, to which DCS could send mail but had also reported that "she had been residing with friends, family and . . . at some point was homeless." This testimony indicates that Ms. Hickey attempted to remain in contact with Mother regarding her housing situation. When Mother began to reside with Maternal Grandfather at a hotel approximately one month before trial, Ms. Hickey scheduled a home visit. This visit was cancelled when Ms. Hickey received a call from Mother stating that Mother's vehicle had broken down and that she would not be home on time. When Ms. Hickey attempted to reschedule during Mother's most recent visit with the Child prior to trial, Mother informed Ms. Hickey of the newest housing arrangement at the trailer. We determine that the trial court properly declined to weigh an alleged lack of reasonable efforts on DCS's part in its analysis of the Child's best interest.

The trial court's analysis indicates that it also explicitly weighed statutory factor five, the effect a change of caretakers and physical environment would likely have on the Child, against preserving Mother's parental rights. *See* Tenn. Code Ann. § 36-1-113(i)(5). We note that Mother and Father each respectively testified that the Child received excellent care and was thriving with the foster parents, with whom the Child had resided from the age of two months. The foster parents also had indicated to DCS that they wished to adopt the Child.

In addition, the remaining statutory factors cannot be said to weigh in favor of preserving Mother's parental rights to the Child. Mother had been adjudicated neglectful toward the Child (factor six), and Mother conceded that she had made no child support payments despite being court-ordered to do so (factor nine). *See* Tenn. Code Ann. § 36-1-113(i). Upon a careful and thorough review of the record, we conclude that there is clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

## B. Father

Although Father has not raised the issue of whether termination of his parental rights was in the Child's best interest, DCS has properly raised the issue for our consideration. Having found at least one ground for termination of parental rights, a trial court is required to consider, as we must on review, whether termination of those rights is in the Child's best interest. *See* Tenn. Code Ann. § 36-1-113(i); *In re Audrey S.*, 182 S.W.3d at 877. From a thorough examination of the record before us, we conclude that there is clear and convincing evidence that termination of Father's parental rights was also in the Child's best interest.[1]

---

[1] In reaching this conclusion, we are mindful of the evidence presented that Father had written weekly letters to the Child during his incarceration and that both parents had consistently expressed sincere love

## VIII. Conclusion

The decision of the trial court is affirmed in part and reversed in part. We reverse the trial court's finding of clear and convincing evidence of the statutory ground of abandonment through failure to provide a suitable home as to Mother only. We affirm the trial court's judgment in all other respects, including the termination of Mother's and Father's parental rights to the Child. Costs on appeal are assessed equally to the appellants, Wanda M. and Christopher E. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating parental rights and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

---

and concern for the Child. As DCS stated in its responsive brief on appeal, "Mother's and Father's attempts to maintain a parent-child bond [are] commendable."